**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WEBMD HEALTH CORP.,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ANTHONY T. DALE,** | : | |
| **Defendant** | : | **No. 11-5827** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

PRATTER, J.                                                          AUGUST 9, 2012

Plaintiff WebMD Health Corporation ("WebMD") sued its former employee, Defendant Anthony Dale, after he left his job at WebMD to work at Health Grades, Inc. ("Health Grades") claiming that he has breached his Restrictive Covenants Agreement, violated Delaware's Uniform Trade Secrets Act, engaged in unfair competition, and converted WebMD's trade secrets and confidential information. Just a few days after filing its Complaint, WebMD also moved for a preliminary injunction, seeking specific enforcement of the Restrictive Covenants under the breach of contract count in the Complaint. Following several months of discovery that was marked by time-consuming acrimony, the Court held a preliminary injunction hearing on May 14, 15, 21 and 22, 2012,[1] received post-hearing submissions from the parties, and now makes the following findings of fact and conclusions of law.

**I.      Findings of Fact**

**A.      WebMD's Business**

1.      Plaintiff WebMD, a Delaware corporation with a principal place of business in New York, New York, disseminates health information to consumers, healthcare professionals,

---

[1]      Citations to the hearing will appear in the following format: Date Tr., Page:Lines.

employers, and health plans through public and private websites, mobile device applications, and other health-focused publications.  5/14/12 Tr., 40:17-41:7, 42:13-23.

2.     In addition to other websites on similar topics, WebMD operates www.WedMD.com, which targets to consumers, and www.Medscape.com, which targets healthcare professionals.  5/14/12 Tr., 42:13-23.

3.     WebMD charges for advertising, webpage sponsorships, and other online products and services on its websites.  5/14/12 Tr., 43:8-17.  WebMD's consumer websites provide a broad range of health and wellness-related content directed to consumers interested in, for instance, learning about specific medical conditions or medications, or finding a physician.  *Id.*, 41:11-22; 44:2-13.

4.     WebMD's consumer advertiser customers include pharmaceutical, biotechnical, medical device and consumer product companies, hospitals, and other similar entities.  5/14/12 Tr., 42:24-43:7.  WebMD also sells advertising and sponsorships for its health professional-directed websites.  *Id.*, 43:19-23.

5.     Prior to September 2011, WebMD had commenced the establishment of a hospital customer base.  WebMD's revenues from hospitals were about $1 million in 2009, $3.5 million in 2010, and $5.5 million in 2011.  5/15/12 Tr., 212:24-213:5.  WebMD hopes to increase revenues at a similar rate in 2012, to between $7-10 million.  *Id.*, 213:6-15.  These revenues are from the sale of online advertising and sponsorships.  *Id.*, 212:1-6; 237:2-11.

6.     In 2011, WebMD had about 140 hospital customers that purchased online advertising or promotion.  *Id.*, 236:25-237:1.  At one time or another since 2004, WebMD has

2

had more than 300 hospital customers from across the United States under contract.  Ex. 125.[2]

7.      Hospitals, and the people who assist hospitals in making decisions about advertising, can choose from a wide variety of types of online advertising and non-online advertising.  WebMD's contacts when attempting to establish or expand a hospital account are sometimes hospital employees and often ad agency employees.  5/15/12 Tr., 219:16-20; 238:20-239:10.

**B.      Mr. Dale's Work for WebMD**

8.      Defendant Anthony Dale began working for Medscape in December 2000.  Medscape was acquired by WebMD in 2001.  5/21/12 Tr., 158:3-11.

9.      Throughout his 10-year career at WebMD, Mr. Dale worked in sales, selling online advertising and sponsorships to pharmaceutical companies and medical device manufacturers, including two of WebMD's largest national pharmaceutical companies, Bristol-Myers Squibb and Johnson & Johnson.  5/14/12 Tr., 46:19-47:9; 51:10-17; 5/21/12 Tr., 161:5-162:2.  In the last three or four years of his career at WebMD, Mr. Dale divided his time between selling advertising on WebMD's site focused on medical professionals and on WebMD's site focused on consumers.  5/21/12 Tr., 164:12-16; 165:3-166:22.  While at WebMD, he personally did not sell any advertising to hospitals.  5/14/12 Tr., 144:17-20; 5/21/12 Tr., 178:23-179:15.

10.     In June 2011, Mr. Dale was promoted to Group Vice President.  As one of four Group Vice Presidents in the company, he was a senior member of the sales management team.

---

[2]      Exhibit 125, as well as several other documents and portions of testimony, is under seal.

3

5/14/12 Tr., 46:17-47:24; 5/21/12 Tr., 158:6-8; 161: 22-162:2; 172:25-173:1.

11.    In 2010, Mr. Dale's last full year of employment with WebMD, he earned more than $1 million in combined salary, commissions, variable management compensation and realized profits from the exercise of stock options.  5/14/12 Tr., 48:2-8; 5/21/12 Tr., 171:11-16.

12.    As a senior member of the sales department, Mr. Dale was exposed to a wide variety of information that WebMD classifies as confidential.  For instance, WebMD develops and commissions a large amount of confidential market research about its websites, audiences, and competitors.  5/14/12 Tr., 97:13-20.  In particular, WebMD's market research reveals information about the habits, preferences, attitudes, and search terms used by consumers visiting WebMD's websites, as well as the strengths and weaknesses of WebMD.  5/14/12 Tr., 96:1-97:2; 99:23-100:9; 103:12-22; 108:9-109:9; 112:3-18; 5/15/12 Tr., 54:22-55:13.  Some, but not all, of this information may be shared with WebMD's customers or prospective customers, and then only selectively.  *See, e.g.*, 5/14/12 Tr., 112:23-113:7.  Some of this research is reported on a monthly basis.  *See, e.g.,* 5/15/12 Tr., 54:22-55:4.[3]

13.    Mr. Dale was also involved in developing strategies for sales, marketing, and product development at WebMD.  5/14/12 Tr., 48:9-22.  For instance, Mr. Dale helped develop a new product that would help sponsors directly reach particular populations, as well as new mobile products targeted to physicians and patients.  *Id*., 50:10-13; 132:22-135:17; 137:10-138:5; 139:2-21.  At least some of these products had not been implemented as of the hearing in this matter.  *Id*., 139:22-140:11.  Just months before his resignation, Mr. Dale also learned the details

---

[3]    Mr. Dale asks the Court to ignore a marketing study because WebMD failed to produce it during discovery.  The Court's finding remains the same whether the Court considers that single study or not.

of a new advertising guarantee program designed to help WebMD compete with other companies offering advertising guarantees, as well as a new product designed to allow advertisers to reach patients intending to see a doctor within a certain period of time. *Id*., 130:13-132:21; 142:1-17; 5/15/12 Tr., 45:13-16; 46:21-47:6; 50:1-5. As to marketing, Mr. Dale was intimately involved in WebMD's market positioning strategy. 5/14/12 Tr., 86:1-87:15; 117:20-120:25; 122:19-22.

14. As a sales executive, Mr. Dale was also exposed to WebMD's pricing strategies and practices. 5/14/12 Tr., 87:16-88:9; 94:24-95:23. WebMD considers its pricing information and rate cards to be confidential. *Id.*, 91:6-13; 5/15/12 Tr., 8:12-14. WebMD customers, although aware of the final prices they pay, do not see WebMD's rate card, and WebMD's relationships with customers are usually governed by nondisclosure agreements. 5/15/12 Tr., 8:12-14; 59:4-8; 59:20-23; 60:12-61:1. WebMD drafts a new rate card each year. *See id.*, 61:11-19. The WebMD rate card is used for sales to all types of customers. 5/14/12 Tr., 91:6-13.

15. The confidential information that Mr. Dale learned at WebMD could potentially be useful to a competitor selling online advertising on health and wellness websites. *See* 5/14/12 Tr., 64:8-18; 5/21/12 Tr., 52:9-53:22.

16. In the course of his employment with WebMD, Mr. Dale signed multiple agreements that contained covenants not to compete. Most recently, on July 9, 2011, he signed a Restricted Stock Agreement in exchange for shares of restricted stock, and that agreement contained provisions in which Mr. Dale agreed not to work for any competitive business anywhere in the world for a period of one year after termination of his employment at WebMD without WebMD's permission. The Agreement defines "Competitive Business" as:

(i) any enterprise engaged in developing, selling or providing (via the internet or other

5

means) health or wellness information, decision support tools or services or application and/or communication services, directly or indirectly, to consumers, health and/or benefit plan members or employees or healthcare professionals, including but not limited to products or services that provide information on diseases, conditions or treatments, store health care information, assess personal health status, and/or assist in making informed benefit, provider or treatment choices; and (ii) any enterprise engaged in any other type of business in which the Company or one of its Affiliates is also engaged, or plans to be engaged, so long as I am directly involved in such business or planned business on behalf of the Company or one of its Affiliates.

Ex. I, ¶¶ 2(b), 2(c) of Restrictive Covenants Agreement (hereinafter "Agreement").[4]

17.     The Agreement signed by Mr. Dale also provides for the automatic extension of the one-year restrictive period for any period of time during which the Agreement is breached. Ex. I, ¶ 4 of the Agreement.  In the Agreement, Mr. Dale also acknowledged that while working for WebMD he would have access to trade secrets and proprietary information and that WebMD "has a compelling business interest in preventing unfair competition stemming from the intentional or inadvertent use or disclosure of [WebMD's] Trade Secret and Proprietary Information." *Id.*, ¶¶ 1(a), 1(d) of the Agreement.  He also agreed that if the geographic, temporal, or scope restrictions were deemed unenforceable as stated, "said area, length or scope shall, for purposes of this Agreement, be deemed to be the maximum area, length of time or scope that such court would deem valid and enforceable, and that such court has the authority under this Agreement to rewrite (or 'blue-pencil') the restriction(s) at-issue to achieve this intent." *Id.*, ¶ 5 of the Agreement.

18.     Confidential information is defined in the Agreement as "valuable information

---

[4]     The Agreement also contains provisions barring Mr. Dale from revealing confidential information and/or trade secrets at any time and from soliciting WebMD customers with whom he had a relationship through his employment at WebMD or employees.  Ex. I, ¶¶ 1(b), 3(b).  These portions of the Agreement are not at issue in this case.

relating to the business of the Company and its Affiliates that provides the Company and its Affiliates with a competitive advantage (or that could be used to the disadvantage of the Company and its Affiliates by a Competitive Business (as defined herein)[)], which is not generally known by, nor easily learned or determined by, persons outside the Company and its Affiliates." Ex. I, ¶ 1(a) of the Agreement.  The Agreement also specifically includes such items as "sales plans and projections, product pricing information, acquisition, expansion, marketing, financial and other business information and existing and future products and business plans of the Company and its Affiliates;" "sales proposals, demonstrations systems, sales material;" and "research and development."  *Id.*, ¶¶ 1(a)(c), (a)(d), (a)(e) of the Agreement.

19.     On August 26, 2011, Mr. Dale notified Dorothy Gemmell, his supervisor and WebMD's Senior Vice President of Sales and Sales Operations, that he planned to resign from WebMD.  5/14/12 Tr., 56:20-57:2.  Mr. Dale's immediate description to Ms. Gemmell of his expected new position at Health Grades was not precise.  He told her that he would be a senior vice president leading a large sales team, and that his job would involve sales, marketing, and product development.  5/14/12 Tr., 57:6-58:3.  When Ms. Gemmell asked him what he would be selling, he explained only that his position was "evolving," and that his sales would be directed to hospital customers.  5/14/12 Tr., 58:4-11.

20.     On September 9, 2011, Mr. Dale's last day of work at WebMD, he explained, in an exit interview, that he would be helping hospitals market themselves through online promotion.  5/14/12 Tr., 62:13-63:22.  As an example, he stated that he would help hospitals use traditional and online media to reach targeted patient populations to get them to choose his hospital clients for their treatment.  *Id.*, 63:10-22.

21.     On September 12, 2011, Mr. Dale began working at Health Grades.  Ex. 4.

**C.     Health Grades's Business**

22.     Health Grades's website www.HealthGrades.com is designed to help consumers gather information about healthcare providers.  Its website www.BetterMedicine.com provides consumers with information on diseases and conditions.  5/15/12 Tr., 126:1-13.

23.     The bulk of Health Grades's revenues comes from its Hospital Division, which sells four main products:  Patient Direct Connect, Customer Relationship Management Software, direct mail campaigns, and Quality Achievements.  5/15/12 Tr., 103:12-14; 105:22-106:23; 172:5-10.

24.     Patient Direct Connect provides visitors to www.HealthGrades.com with access to physician profiles based on the visitors' search criteria.  Physicians affiliated with hospitals that are customers of Health Grades have much more detailed profiles, which also allow visitors to make an appointment online or through a call center.  5/15/12 Tr., 110-22-128:6; Exs. T-1, O-1.

25.     When hospitals buy Health Grades's Patient Direct Connect product, in addition to the detailed profiles of their physicians and the call center and online appointment features, they also receive banner advertising on www.HealthGrades.com.  5/15/12 Tr., 110:22-132:21; Exs. T-1, O-1, 44.

26.     Health Grades's Customer Relationship Management Software helps hospitals manage, understand, and communicate with their patients and physicians by collecting data about patients and physicians and facilitating the analysis of that data.  5/15/12 Tr., 185:20-194:5; 194:23-198:17; Ex. U-1.  Direct mail campaigns go hand in hand with the Customer Relationship Management Software, using data collected about patients to send them targeted mailings.

5/15/12 Tr., 188-10-20; 199:18-200:3.

27.     Health Grades's original core business, Quality Achievements, involves the analysis of data on hospitals to rank them, both numerically and by a system of star ratings, in a host of different diagnoses and procedures.  5/15/12 Tr., 133:25-139:15; Ex. T-1.  Hospitals ranked or rated by Health Grades may buy a license to use the rank or rating in their marketing campaigns.  When purchasing such a license, hospitals may also purchase banner advertisements on www.HealthGrades.com using the rank or rating.  5/15/12 Tr., 139:16-142:14; Ex. T-1.

28.     Health Grades currently has approximately 800 hospital clients.  5/15/12 Tr., 165:22-23.  At the time of the hearing, 30 hospitals were clients of both Health Grades and WebMD.  5/15/12 Tr., 229:22-230:2; Ex. 132-A.  This number does not include hospital customers of WebMD whose advertising campaigns had ended before the hearing in this matter or who intended to sign contracts for additional advertising.  5/15/12 Tr., 231:7-232:25.

29.     WebMD does not sell customer relationship management software, licenses of ratings and/or rankings, call center or online appointment access, or direct mail campaigns. 5/14/12 Tr., 146:1-12; 5/15/12 Tr., 244:9-12; 244:25-245:4; 248:7-17.  Earlier this year, however, (and post-Mr. Dale's change of employers) WebMD competed directly against Health Grades for at least two hospital customers.  5/15/12 Tr., 218:3-17; 218:25-219:2; 219:5-15; 240:2-22.

30.     Health Grades's InHealth Division operates www.BetterMedicine.com and sells online advertising primarily to pharmaceutical, consumer packaged goods, and medical device companies.  5/15/12 Tr., 103:15-21; 5/21/12 Tr., 156:9-157:4.  The www.BetterMedicine.com website contains content similar to that on www.WebMD.com, including posting articles about

9

medical conditions, physician directories, symptom checkers, drug information, health surveys, and the like.  5/14/12 Tr., 67:14-69:13; Exs. 53, 54, 111, 127-130.

31.     Health Grades's two websites www.HealthGrades.com and www.BetterMedicine.com also share online links, and www.HealthGrades.com now has more health and wellness content, in addition to its physician directory.  The two websites, by design, have become increasingly integrated.  5/14/12 Tr., 72:8-74:14; 5/15/12 Tr., 216:22-217:8; 5/21/12 Tr., 91:17-93:2; Exs. 7, 18, 51, 127-130.

**D.     Mr. Dale's Job at Health Grades**

32.     At Health Grades, Mr. Dale is the Senior Vice President of Client Development for the Hospital Division.  As such, he and his team sell Physician Direct Connect, Customer Relationship Management Software, direct mail campaigns, and Quality Achievements to Health Grades's existing hospital customers.  5/21/12 Tr., 180:8-181:7; 186:20-22.

33.     Mr. Dale has avoided interaction with Health Grades's InHealth Division. 5/21/12 Tr., 156:2-20.

34.     Of the 30 hospitals that were, as of the time of the hearing, customers of both WebMD and Health Grades, only 14 of them were customers of WebMD at the time Mr. Dale worked there, and of those 14, only four were hospitals that Mr. Dale had contacted since joining Health Grades or planned to contact in the next six months.  5/15/12 Tr., 254:14-256:23; Ex. 132-A.

35.     In spite of Mr. Dale's avoidance of InHealth, Mr. Dale was involved in negotiating a contract with Edward Hospital.  In addition to including the sale of Patient Direct Connect, that contract specifically provided for online advertising on both

www.HealthGrades.com and www.BetterMedicine.com.  5/21/12 Tr., 18:15-20:13;
219:1-220:10; 221:18-222:4; Exs. 34, 55.

36.      In addition to his involvement in the Edward Hospital transaction, Mr. Dale has
also attended or otherwise received in-house slide presentations that show that one of Health
Grades's goals is to increase sales of online advertising to hospitals on both of its main websites.
See Exs. 7, 51.

37.      As part of the Health Grades team, Mr. Dale's input has been solicited on new
products with online advertising components and on sales materials for online advertising,
including on mobile devices.  See 5/21/12 Tr., 33:1-2, 34:12-22; 35:18-36:3; 214:3-215:8; Exs.
7, 47.

38.      Mr. Dale's supervisor at Health Grades, Mr. John Hallick, has not and does not
monitor Mr. Dale's compliance with his non-competition Agreement, nor does he know what
Mr. Dale's job at WebMD was.  5/15/12 Tr., 157:1-6; 176:23-24; 204:24-205:7.

39.      WebMD has not identified any loss of sales or profits specifically tied to Mr.
Dale's employment at Health Grades.  5/14/12 Tr., 144:9-16; 5/15/12 Tr., 251:25-252:4.

40.      Mr. Dale has an indemnification agreement with Health Grades, whereby Health
Grades has agreed to indemnify Mr. Dale for any losses sustained as a result of this lawsuit.  See
Ex. N.

## II.      Conclusions of Law

41.      In accordance with Federal Rule of Civil Procedure 65, a Court may grant the
extraordinary remedy of a preliminary injunction "only if '(1) the plaintiff is likely to succeed on
the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction

will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'" *P.C. Yonkers, Inc. v. Celebrations the Party Seasonal Superstore LLC*, 428 F.3d 504, 508 (3d Cir. 2005).

### A.  Likelihood of Success on the Merits

42.     As both parties acknowledge, and as the Agreement clearly states, Delaware law governs the interpretation, validity and enforcement of the Agreement.  Ex. I, Section 3.10. Looking only at the terms of the contract itself, before examining its enforceability or reasonableness, WebMD is likely to be able to prove that Mr. Dale is in breach of the literal terms of the contract: only days passed between the time he stopped working at WebMD and started working at Health Grades, a company that easily fits the Agreement's stated definition of "Competitive Business."  Thus, the Court will now examine the likelihood that WebMD will be able to prove that the Agreement is reasonable and enforceable under Delaware law.

43.     In evaluating covenants not to compete under Delaware law, a court looks to whether the contract "(1) meet[s] general contract law requirements, (2) [is] reasonable in scope and duration, both geographically and temporally, (3) advance[s] a legitimate economic interest of the party enforcing the covenant, and (4) survive[s] a balance of the equities." *All Pro Maids, Inc. v. Layton*, No. Civ. A. 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 10, 2004).  A court must also decide whether the contract was breached and, if so, "whether specific performance or some other remedy is appropriate under the circumstances." *Id.*, at *3.

44.     Because both parties freely agreed to the terms of the contract and Mr. Dale's promises were clearly supported by adequate consideration, WebMD will have no trouble proving that the Agreement meets the general contract law requirements of mutual assent and

consideration to support it enforceability.

45.     As to the temporal scope of the Agreement, the one-year length of the covenant not to compete is not patently unreasonable.  Delaware courts routinely hold that covenants as long as two years are reasonable, particularly when the employee is not an unskilled worker without specialized training.  *Weichert Co. of Pa. v. Young*, C.A. No. 2223-VCL, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007).

46.     Significantly broader is the Agreement's worldwide geographic scope.  Because of the nature of WebMD's internet-based business, however, this unlimited geographic reach is not unwarranted - WebMD's site can be viewed internationally.  Moreover, the unlimited geographic reach is necessarily limited by the covenant's application to "Competitive Businesses," rather than to any possible other employment anywhere in the world.  Under such circumstances, courts applying Delaware law have upheld similar geographically-broad restrictions.  *See Research & Trading Corp. v. Pfuhl*, Civ. A. No. 12527, 1992 WL 345465, at *11-12 (Del. Ch. Nov. 18, 1992).

47.     To be enforceable under Delaware law, a covenant not to compete must protect the legitimate economic interests of the employer.  Those interests may include the protection of good will or of confidential information.  *See Pfuhl*, 1992 WL 345465, at *12.  The employer's legitimate economic interests relevant to the third element of the covenant not to compete test are judged at the time of contracting.  *Hough Assocs. v. Hill*, Civ. A. No. 2385-N, 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007).

48.     WebMD's good will is not implicated in this case.  Mr. Dale never sold anything to hospitals while working at WebMD, and he only sells to hospitals at Health Grades.  *See*,

*supra*, ¶¶ 9, 32.

49.     Mr. Dale learned confidential information about WebMD's pricing, pricing strategies, marketing strategies, product development, market research, and strengths and weaknesses while employed by WebMD, and he acknowledged as much when he signed the Agreement.  While some of this information is necessarily revealed, piecemeal, to advertisers and others by the simple act of transacting business, the bulk of this information is kept confidential and is therefore entitled to protection.[5]  *See*, *e.g., supra*, ¶¶ 12-15, 18.

50.     WebMD Senior Vice President Dorothy Gemell testified that much of this information does not change significantly over time.  *See, e.g.,* 5/15/12 Tr., 6:21-7:6; 15:10-16. This testimony was only partly credible for the simple reason that many of the items listed as confidential admittedly are updated on at least a yearly basis, if not more frequently.  *See, e.g., supra*, ¶¶ 12, 14.  Some of this information becomes obsolete or is otherwise discarded, replaced or merely dated.  *See* 5/15/12 Tr., 65:22-66:24.  Nevertheless, the Court concludes that WebMD likely will sustain its burden to prove that it does have a legitimate economic interest in preventing competitors from learning much of this information and using it to compete against WebMD.

51.     That being said, WebMD is not at all likely to be able to prove that its legitimate economic interests, even at the time of contracting, can sustain the very broad definition of "Competitive Business" contained in the Agreement.  The Agreement defines "Competitive

---

[5]     Although Mr. Dale does dispute whether the information he learned is actually confidential, whether it would be useful to him in his new job, whether it is still current, and whether he still remembers sufficient details to pose any threat to WebMD, he does not dispute that he was privy to this information during his time at WebMD.

Business" as:

> (i) any enterprise engaged in developing, selling or providing (via the internet or other means) health or wellness information, decision support tools or services or application and/or communication services, directly or indirectly, to consumers, health and/or benefit plan members or employees or healthcare professionals, including but not limited to products or services that provide information on diseases, conditions or treatments, store health care information, assess personal health status, and/or assist in making informed benefit, provider or treatment choices; and (ii) any enterprise engaged in any other type of business in which the Company or one of its Affiliates is also engaged, or plans to be engaged, so long as I am directly involved in such business or planned business on behalf of the Company or one of its Affiliates.

Ex. I, ¶ 2(c) of the Agreement.[6]

52.     Taken as written, subpart (i) of the definition could describe nearly any business that provides its employees with, for instance, detailed information about health care benefits. Even construed slightly less broadly, the definition could easily apply to, for instance, a breakfast cereal company, a skin care company, or even a yoga studio that touts the health benefits of its products or services to consumers. WebMD certainly could not prove that it ever had any legitimate economic interest in preventing Mr. Dale from becoming a yoga instructor or from touting Wheaties®. Indeed, it admits as much. 5/15/12 Tr., 78:16-79:7.

53.     Moreover, as written, the definition does not even seem to reflect accurately how WebMD makes its money. Based on the evidence presented, WebMD does not make money directly by developing, selling, and providing health and wellness information, but rather by

---

[6]     The Court agrees with WebMD that the final clause, "so long as I am directly involved in such business or planned business on behalf of the Company or one of its Affiliates," modifies only subpart (ii) of the definition, both because of the semicolon at the end of subpart (i) and because the "so long as" clause directly tracks the language in the rest of subpart (ii). Because Mr. Dale was not directly involved in the sale of advertising to hospitals while at WebMD, subpart (ii) does not apply, and the Court will focus on subpart (i).

developing and providing that information and selling advertising and sponsorships to companies interested in reaching consumers of health and wellness information and/or health professionals. *See, e.g., supra*, ¶¶ 3, 4.

54.     Mr. Dale argues that, to the extent the Court finds the Agreement's definition of Competitive Business to be overbroad, the Court should not enforce the Agreement or "blue pencil" the Agreement to make it enforceable.  He cites in support *Elite Cleaning Co., Inc. v. Capel*, No. 690-N, 2006 WL 4782306, at \*8-9 (Del. Ch. June 2, 2006), as well as a number of cases applying the laws of states other than Delaware.[7]   *See, e.g., Merrimack Valley Wood Products, Inc. v. Near*, 876 A.2d 757, 763-64 (N.H. 2005) (applying New Hampshire law); *Delaware Elevator, Inc. v. Williams*, 2011 WL 1005181, at \*11 (Del. Ch. Mar. 16, 2011) (applying Maryland law).[8]

55.     In *Elite Cleaning*, a cleaning company sued a janitor who left the company to work directly for one of the company's clients.  2006 WL 4782306, at \*1.  When looking at the agreement in that case, the only provision the court found to be manifestly unreasonable was the temporal scope of the agreement.  The court noted that it "could" reform the noncompetition agreement, but declined to do so because the equities weighed so heavily against enforcement,

---

[7]     Mr. Dale also cites *Take-A-Break Services, Inc. v. Grose*, Civ. A. No. 11217, 1990 WL 67392, at \*4 (Del. Ch. May 30, 1990).  In *Take-A-Break*, neither party disputed the general validity of the contract; rather, the controversy centered on the balance of the equities in specifically enforcing the contract.  1990 WL 67392, at \*3.  Thus, *Take-A-Break*'s relevance is to that portion of the conclusions of law in this matter.

[8]     Even though the *Delaware Elevator* court expressed its distaste for "blue-penciling" covenants not to compete, that court ultimately *did* "blue pencil" the agreement in question in that case.  *See Delaware Elevator*, 2011 WL 1005181, at \*11.

given that the defendant in that case was an unskilled worker making little more than minimum wage with no knowledge of trade secrets, special skills or training, or intent or ability to take business away from the plaintiff. *Id.*, at *9. Clearly, that case is distinguishable from this one.

56.     Not only does the Agreement in this case have a specific provision allowing for "blue penciling," Delaware courts themselves "blue pencil" restrictive covenant agreements that may be otherwise unenforceable, if the equities so dictate. *See, e.g., RHIS, Inc. v. Boyce*, No. Civ. A. 18924, 2001 WL 1192203, at *7 (Del. Ch. Sept. 26, 2001) (reducing temporal scope of a covenant not to solicit to two years, rather than one).

57.     Here, as discussed more fully below, a court in this case likely can be convinced that the equities do call for the reform of the Agreement at issue in this case, and therefore a judicial "blue pencil" can be taken to this Agreement, limiting its reach only to companies that actually compete with WebMD.

58.     Next, a court must determine whether the covenant not to compete at issue would survive a balance of the equities. Balancing the equities requires the Court to look to the actual situation confronted by the parties at the time specific enforcement is sought and to weigh the potential harm to the company's legitimate economic interests against the employee's freedom, absent the covenant not to compete, to work in whatever job he chooses. *See Pfuhl*, 1992 WL 345465, at *13.

59.     WebMD and Health Grades are competitors when it comes to selling online advertising on websites offering health and wellness information to consumers. Just because the two companies compete in some areas, however, does not mean that Mr. Dale should be barred from working for Health Grades in any and every capacity. *See, e.g., Take-A-Break*, 1990 WL

67392, at *4-5 (acknowledging that defendant's former and current employers were direct competitors, but refusing to bar defendant from working for current employer in any capacity when her job at her new employer did not implicate the legitimate economic interests of her former employer).

60.    As noted above, WebMD is likely to succeed in proving that it does have a legitimate economic interest in its confidential information, and this Court has already found that Mr. Dale was exposed to confidential information during his employment at WebMD.  For much of what Mr. Dale does at Health Grades, however, that confidential information has very little, if any, utility, inasmuch as the information largely relates to the sale of online advertising on a health and wellness website.  Two of the core products that Mr. Dale sells, the Customer Relationship Management Software and direct mail campaigns, have nothing to do with advertising on a health and wellness website, and online advertising is only one component of the Patient Direct Connect and Quality Achievement products.  *See, supra*, ¶¶ 24-27.

61.    Moreover, the Court is not persuaded that WebMD has shown that www.HealthGrades.com, to the extent it offers ratings of physicians and assists patients in making appointments with physicians, directly competes with WebMD's websites, such that Mr. Dale's knowledge of confidential information would give him or his new employer an unfair advantage when selling products that include advertising on that portion of www.HealthGrades.com.

62.    However, WebMD *has* shown that the type of content included on www.BetterMedicine.com is very similar to that on www.WebMD.com, and that www.HealthGrades.com and www.BetterMedicine.com are becoming increasingly integrated,

18

such that health and wellness information beyond a mere physician directory is appearing on www.HealthGrades.com.  *See, supra*, ¶¶ 30, 31, 36.  WebMD has also shown that although Mr. Dale claims to have absolutely no involvement with InHealth or www.BetterMedicine.com, he has participated in the negotiation of at least one contract that specifically included advertising on www.BetterMedicine.com.  *See id.*, ¶ 35.  Furthermore, WebMD has shown that Health Grades intends to increase its sales of online advertising at the same time that it increases the integration between www.HealthGrades.com and www.BetterMedicine.com.  *See id.*, ¶¶ 31, 36.

63.     That Mr. Dale sold only to pharmaceutical and medical device companies when he worked at WebMD is of no moment.  Mr. Dale's knowledge of market research information about consumers of health and wellness information and his knowledge of WebMD's strengths, weaknesses, and market positioning strategy, for instance, could be useful in selling online advertising on a health and wellness information site to any type of customer, and particularly in selling online advertising against WebMD.  Likewise, WebMD's standard rate card applied to all of its sales, regardless of the target customer, and therefore could be useful in selling to any type of customer against WebMD.  Although some time has passed since Mr. Dale worked for WebMD, the Court agrees with WebMD that it would likely be difficult for Mr. Dale not to use any of the confidential information he learned while working at WebMD in selling online advertising for Health Grades.  However, the length of time for which that information would be competitively useful and for which Mr. Dale would likely be able to remember[9] salient details does not extend long into the future.

---

[9]     There is no claim here that Mr. Dale departed WebMD with any written or electronically stored information.  The only information he arguably had was "in his head."

64.     Therefore, WebMD is reasonably likely to be able to prove that it does have legitimate economic interests that are threatened by Mr. Dale's new role, but only to the extent that he sells online advertising.  Forcing Mr. Dale to have delayed, or now to leave his new job for a year, when the bulk of his job has very little to do with products that are directly competitive with WebMD's products would be unduly harsh and, in practical terms, pointless.

65.     WebMD's alternative request is much more in line with the facts of this case - preventing Mr. Dale from engaging in or supervising the sale of online advertising on www.HealthGrades.com and www.BetterMedicine.com for a period of time would sufficiently protect WebMD's legitimate economic interest.[10]  While the Court sees a full "evergreen" extension of this prohibition to be excessive, an extension of about a calendar quarter, *i.e.*, until December 31, 2012, would serve all equitable purposes.  *See Fres-Co System USA, Inc. v. Bodell*, No. Civ. A. 05-3349, 2005 WL 3071755, at *8 (E.D. Pa. Nov. 15, 2005) ("Sitting in equity, a court has broad powers to craft appropriate injunctive relief, but it must carefully weigh all the facts of the case in deciding what is equitable.").  *Cf. Take-A-Break*, 1990 WL 67392.

66.     The harm to Mr. Dale, on the other hand, of having to refrain from engaging in or supervising the sale of online advertising for a relatively brief period of time would be minimal.

---

[10]     WebMD also asks the Court to prohibit Mr. Dale from contacting any pharmaceutical or medical device company or any other entity on WebMD's customer list. Because WebMD is already protected by a non-solicitation agreement, which is part of the larger Agreement at issue in this case, and does not contend that Mr. Dale has breached that portion of the Agreement in any way, entering a preliminary injunction containing such terms would be an unnecessary and imprudent use of the Court's equitable powers.  Indeed, prohibiting Mr. Dale from contacting WebMD hospital customers, with whom Mr. Dale had no contact while at WebMD, would extend the non-solicitation provision of the Agreement beyond its terms and would serve no legitimate economic interest of WebMD as long as Mr. Dale is selling a product other than online advertising.

Indeed, Mr. Dale has an indemnification agreement with Health Grades, whereby Health Grades has agreed to indemnify Mr. Dale for any losses sustained as a result of this lawsuit.  *See* Ex. N. Moreover, at the hearing in this case, Mr. Dale testified that he had no reason to believe that his job with Health Grades was in jeopardy.  5/21/12 Tr., 244:16-24.  Mr. Dale has repeatedly emphasized that online advertising represents only a small portion of his job at Health Grades; taking him at his word, then, means that restraining him from selling online advertising would have a correspondingly small impact on him.

67.     For the foregoing reasons, the Court finds that WebMD is likely to succeed on its breach of contract claim, although it is unlikely to convince a court to enforce the Agreement in full.

### B.     Irreparable Harm to WebMD

68.     Having determined that WebMD is likely to succeed on the merits of its breach of contract claim, the Court must determine whether not granting a preliminary injunction would result in irreparable harm to WebMD.

69.     To establish irreparable harm warranting the imposition of a preliminary injunction, a plaintiff must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial" and that "the preliminary injunction must be the *only way* of protecting the plaintiff from harm."  *Campbell Soup Co. v. Conagra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (emphasis in original).  The risk of irreparable harm is not enough; a plaintiff bears the burden of proving irreparable harm by "a clear showing of immediate irreparable injury."  *Id.* (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)).

70.     Here, Mr. Dale stipulated in the Agreement that employment with a Competitive

Business would constitute irreparable harm warranting injunctive relief, one factor that weighs in favor of finding irreparable harm. See Ex. I, 4 of the Agreement; *see also Telamerica Media, Inc. v. AMN Television Marketing*, No. CIV. A. 99-2572, 1999 WL 1244423, at \*6 (E.D. Pa. Dec. 21, 1999). *Cf. Kansas City Southern v. Grupo TMM*, No. Civ. A. 20518-NC, 2003 WL 22659332, at \*5 (Del. Ch. Nov. 4, 2003) (holding, under Delaware law, that a contractual stipulation alone is enough to demonstrate irreparable harm).

71.     Recently, Health Grades has placed a greater emphasis on online advertising and on the integration of www.HealthGrades.com and www.BetterMedicine.com, making Health Grades and its hospital division a bigger competitive threat to WebMD. *See, e.g., supra*, ¶¶ 31, 36. Mr. Dale's role has already led him to be part of a sale involving online advertising on www.BetterMedicine.com, and he has responsibility for selling at least two products that include an online advertising component. *See, e.g., supra*, ¶ 35. Because he was exposed to confidential information about WebMD's sales, marketing, and pricing strategies, Mr. Dale would be likely to use that information, either consciously or not, when competing against WebMD in selling online advertising.

72.     The lack of any monitoring by his new employer of Mr. Dale's compliance with the Agreement also weighs in favor of a finding of irreparable harm. *See, e.g., supra*, ¶ 38.

73.     Finally, preliminary injunctions are designed for situations such as this, when quantifying the effects of a breach of an agreement would be exceedingly difficult. *See Intermetro Indus. Corp. v. Kent*, No. 3:CV-07-0075, 2007 WL 1140637, at \*8 (M.D. Pa. Apr. 17, 2007) (finding irreparable harm when former employee was exposed to confidential information, even though he retained only a general understanding of the information); *Fisher Bioservices,*

*Inc. v. Bilcare, Inc.*, No. Civ. A. 06-567, 2006 WL 1517382, at *20 (E.D. Pa. May 31, 2006)

("Within the Third Circuit, courts have found that injury to goodwill and the use of a company's

confidential information are the types of injuries which would constitute irreparable harm that

cannot be compensated with monetary damages."). *Cf. Hough Assocs.*, 2007 WL 148751, at *18

("Doubtless there is uncertainty about what would have happened if the Non-Competition

Agreement had been honored. That is precisely why our law has consistently found a threat of

irreparable injury in circumstances when a covenant not to compete is breached. Measuring the

effects of breaches like this involves a costly process of educated guesswork with no real

pretense of accuracy.").

### C.    Lack of Irreparable Harm to Mr. Dale

74.    The potential harm to Mr. Dale of a limited enforcement of the Agreement is

minimal, particularly when weighed against the potential harm to WebMD. Although Mr. Dale

will be sidelined for a relatively short period of time from selling online advertising or

overseeing such sales, he is still free to sell at least two of the core products offered by Health

Grades to hospitals.

75.    For the same reasons discussed when balancing the equities of enforcing the

Agreement, the Court finds that Mr. Dale will not suffer irreparable harm should the Court enter

a preliminary injunction as described above, *see supra*, ¶ 66, and that any harm to Mr. Dale

would be outweighed by the harm to WebMD should the Court choose not to specifically enforce

the Agreement at this stage of the case.

### D.    Public Interest

76.    Granting the preliminary injunction in this case will serve the public interest by

"discourag[ing] unfair competition, the misappropriation and wrongful use of confidential information and trade secrets, and the disavowal of freely contracted obligations."  *Graphic Mgmt. Assoc. v. Hatt*, No. 97-CV-6961, 1998 WL 159035, at *19 (E.D. Pa. Mar. 18, 1998).

**E.    Bond**

77.    The Agreement states that in the event of a breach, WebMD is entitled to immediate injunctive relief "without the necessity of . . . posting any bond."  Ex. I, ¶ 4 of the Agreement.

78.    However, under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction . . . *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c) (emphasis added).

79.    In discussing the bond requirement of Rule 65(c), the Third Circuit Court of Appeals recently held "that a district court lacks discretion under Rule 65(c) to waive a bond requirement except in the exceptionally narrow circumstance where the nature of the action necessarily precludes any monetary harm to the defendant, and that such bond shall be issued irrespective of any request by the parties."  *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010).  In *Zambelli*, a case which also involved a covenant not to compete, neither party had requested the posting of a bond, and the former employee-defendant had a indemnification agreement with his new employer which covered any losses suffered as a result of enforcement of the covenant not to compete.  Nonetheless, the Third Circuit Court of Appeals reversed the district court's decision not to require a bond.  *Id*.

80.    Even more recently, the Third Circuit Court of Appeals expressed doubt that a

specific contract provision in a covenant not to compete waiving the requirement of a bond relieved the district court of its duty to set a bond when granting a preliminary injunction.  *See Pharmethod, Inc. v. Caserta*, 382 Fed. Appx. 214, 222 (3d Cir. 2010) (noting that the parties' "purported" agreement to waive the bond requirement "is in tension with the requirements of Rule 65(c)," and remanding the case, specifically instructing the district court "to address and resolve this tension if it refuses to require a bond on this basis").

81.     Despite the contract provision, the lack of a request for a bond, and the indemnification agreement in this case, the Court finds itself constrained by the requirements of Rule 65(c) and will therefore require the posting of a bond.  The Court will set that bond at $25,000, an amount that should be sufficient to compensate Mr. Dale for the brief curtailment of his online advertising sales activities.

### III.   Conclusion

82.     For all of the foregoing reasons, the Court will grant WebMD's Motion for Preliminary Injunction.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E. K. PRATTER
UNITED STATES DISTRICT JUDGE